UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ELYSIA J. WATKINS,

    Plaintiff,

v.                                                                  Case No. 8:21-cv-2022-SDM-CPT

SHAWN FOX,

    Defendant.
_____/

**O R D E R**

Before the Court is *pro se* Plaintiff Elysia J. Watkins's *Motion for Sanctions for [Spoliation] of Evidence*. (Doc. 53). After careful review and with the benefit of both oral argument and an evidentiary hearing, Watkins's motion is denied.

I.

This action stems from the events surrounding Watkins's booking at the Pinellas County Jail on December 25, 2018, following her arrest for disorderly intoxication. (Docs. 21, 38). In her operative complaint, Watkins avers that Defendant Shawn Fox, then a Pinellas County Sheriff's Office (PSCO) deputy,[1] used unlawful force against her during the intake process, including by "thr[owing her] onto a table counter,"

---

[1] Fox is now retired from the PCSO. (Doc. 55-1).

"shov[ing] her handcuffed hands and arms . . . up to the back of her neck," "lift[ing] [her] from the ground by her arm," and "ben[ding] her right hand all the way back, almost breaking her wrist." (Doc. 21 at 4). Watkins also alleges that an unnamed deputy—who Watkins has since identified as non-party PCSO deputy Brett Earling—tapped Fox on the shoulder during this encounter but that Fox nonetheless "continued with [his] attack" on Watkins. *Id.* at 4, 19; (Doc. 37 at 2). Watkins further avers that she suffered "extreme upper body pain" as a result of Fox's actions, that her calls for medical attention initially went unheeded, and that it was only later that she was taken by a wheelchair to the jail's medical area. (Doc. 21 at 5–6). Based upon these allegations, Watkins asserts federal claims for excessive force under the Fourteenth Amendment and 42 U.S.C. § 1983, as well as a state law claim for civil battery. (Doc. 21).

In January 2019, Watkins's criminal defense attorney submitted a public records request to the PCSO seeking Watkins's medical records and her "intake video" at the "Sheriff['s] Office/Jail."[2] (Doc. 74 at 1); (Doc. 74-3). In response, the public records processing unit identified six responsive video clips, produced four of them the same month, and withheld two as exempt under Florida's public records statute. (Doc. 74-1 at 3–4).

---

[2] According to Fox's counsel, the "intake/receiving" area—which is colloquially known as "booking"—is "rather large" and includes booking counters, an area where arrestees are photographed, a machine to screen arrestees for contraband, and holding cells. (Doc. 73 at 22–23).

Also in January 2019, Watkins filed a complaint with PCSO Sheriff Bob Gualtieri, in which she recounted the alleged attack and averred that an unnamed deputy (i.e., Fox) "intentionally battered, assaulted and injured her." (Doc. 75-1 at 2). The PCSO's Professional Standards Bureau, also known as Internal Affairs, investigated Watkins's allegations, *id.* at 7, during which it gathered video recordings of her time at the jail and interviewed nine witnesses, including Watkins. In early March 2019, the PSCO official who spearheaded the Internal Affairs investigation, sergeant (and now lieutenant) Jessica Smith, informed Watkins in writing that there was "insufficient reason . . . to bring about disciplinary action against the accused [PCSO] members." (Doc. 75-1 at 7).

Approximately seven months later, in August 2019, another former attorney of Watkins submitted a "Notice of Claim" to the PCSO pursuant to Section 768.28 of the Florida Statutes. (Doc. 53-1). In that notice, Watkins's counsel stated, *inter alia*, that Watkins was making a claim for damages due to the "excessive force" used against her and the "violation of her civil rights," and that Watkins demanded all relevant documents and recordings be preserved. (Doc. 53-1 at 1–2).

Watkins ultimately filed a lawsuit in state court against Fox and Gualtieri in December 2020. (Docs. 1, 1-3). Fox and Gualtieri removed the action to this Court in August 2021 after Watkins amended her complaint to add a section 1983 claim. (Doc. 1). In August 2022, the Court dismissed Gualtieri from the case because Watkins failed to allege the sheriff's participation in her injury or a basis for municipal liability. (Doc. 20).

In late January 2023, Watkins moved to compel the release of certain audio and video recordings related to the December 2018 booking incident, claiming that Fox's production of surveillance videos from her stint at the jail was incomplete and that the videos had been "manipulated." (Doc. 37). Watkins also sought to compel Fox's disclosure of a purported interview of Earling performed by Internal Affairs. *Id.* In response, Fox represented that no interview of Earling had occurred, that no audio or video footage had been doctored, and that Watkins was provided with all recordings obtained as part of the Internal Affairs investigation. (Doc. 38). After entertaining oral argument on the matter, the Court denied Watkins's motion in March 2023. (Docs. 46, 51).

The next month, in April 2023, Watkins filed a second motion to compel, as well as the instant motion for sanctions. (Docs. 52, 53). In the former filing, Watkins requested the production of an affidavit from Smith "indicating the disposition of the . . . Earling interview." (Doc. 52). Fox countered that Smith had not executed such an affidavit and that he was not required under the discovery rules to procure one. (Doc. 54). Fox also relatedly pointed out that Watkins had not taken any depositions or engaged in any discovery with any third parties. *Id.* The Court heard argument on Watkins's second motion to compel in May 2023 and denied it shortly thereafter. (Doc. 67).

To buttress her sanctions motion, which the Court addressed at the May 2023 hearing as well, Watkins asserted that Fox spoliated both the interview of Earling and the audio and video footage from the jail surveillance cameras. (Doc. 53). In response,

4

Fox reiterated that no interview of Earling had taken place and explained that the only audio or video footage from the jail in existence at the time Watkins filed suit was contained in the Internal Affairs file and turned over to her. (Doc. 55 at 4); (Doc. 73 at 24–25).[3] Anything else, Fox insisted, had "long since been overwritten on the network." (Doc. 55 at 4). Moreover, Fox submitted a sworn affidavit asserting that he did not have access or authority to edit, delete, or alter any of the recordings made by the jail's surveillance equipment during his tenure at the PCSO; that he could not view jail surveillance video without a sergeant or higher ranking deputy logging into the system; that video footage from the jail was retained for only ninety days; and that any recordings which had been preserved would be in the PCSO's possession, custody, or control. (Doc. 55-1).

To clarify the foregoing issues, including the completeness of Fox's audio and video production, the Court set an evidentiary hearing on the matter for June 2023. (Doc. 68). In doing so, the Court directed that Fox "call one or more properly qualified witnesses [at the hearing] to present the video and audio pertinent to the matters raised in [Watkins's] motion and at the [May 2023] oral argument." *Id*. The Court also instructed Watkins to "be prepared to introduce evidence—including, but not limited to, her own testimony—that support[ed] her position that any relevant video or audio was spoliated or manipulated." *Id*. The Court additionally ordered each party to "submit a supplemental memorandum addressing whether [Watkins's] public records

---

[3] Watkins confirmed that she possessed the video produced in response to her public records request. (Doc. 73 at 17).

request to the PSCO . . . rendered the instant litigation reasonably foreseeable to [Fox]," and "setting forth the entirety of the PCSO's response to [Watkins's] public records request." *Id*.

The parties subsequently submitted their respective memoranda as directed (Docs. 74, 75) and the evidentiary hearing proceeded as scheduled. At that hearing, Fox called Smith as a witness and introduced several exhibits through her. These exhibits consisted of the video footage that had been disclosed to Watkins, a diagram of the intake area reflecting the location, orientation, and recording capabilities of the cameras from which the videos were obtained, and a file directory of the recordings disclosed to Watkins.[4] (Docs. 79-1, 79-2). Watkins cross-examined Smith but did not testify or offer any other evidence.

During her testimony, Smith explained that Watkins received fourteen recordings taken from ten cameras either in connection with this suit or in response to Watkins's public records request. Smith also described the events displayed in certain of the videos. Those recordings—which the Court separately reviewed—depict Watkins at the beginning of the booking process with her hands handcuffed behind her back entering the jail through the sally port, walking to the intake receiving area,

---

[4] The videos on the directory are indexed by either camera number or file number. (Doc. 79-2). The eight videos designated by camera number were compiled by Smith in connection with her Internal Affairs investigation, while the six videos denominated by file number were secured via the public records department. Because the videos collected by Internal Affairs and the public records department were derived from some of the same cameras, there is some duplication in the recordings. The Court will utilize either the camera number or the last three digits of the file number when citing these recordings.

and then proceeding to the first of three booking counters, where she interacts with Fox. (Video Files 788 and 365).[5] Cameras positioned at multiple angles captured these events, including a "360" degree camera that recorded audio of the entire encounter. (Video Files 365, 291; Cameras 4031, 4032, 4037).

The recordings further show Watkins—with her hands still cuffed behind her back—being escorted by Fox past the second and third booking counters and towards the holding cell. (Video Files 291, 804; Cameras 4031, 4032, 4037). Two "360" degree cameras located close to the first and second booking counters depict Watkins's progression past these areas as she yelled "don't break my arm" and "you're hurting my wrist." (Cameras 4031, 4037). Both videos, however, end as Watkins approaches the third booking counter. (Cameras 4031, 4037). Nonetheless, a separate camera that recorded audio tracks Watkins as she passes by the third booking counter and enters the holding cell. (Video File 804).

In addition, another video taken from a camera that did not record audio captures the entirety of Watkins's movements from the first booking counter to the holding cell. (Video File 291). This footage was obtained from a camera situated above the sally port and pointed towards the back of the booking area, where the cell can be seen on the left. (Video File 291; Camera 4032).

Finally, the recordings display Watkins entering holding cell 148, where she remains for approximately thirty minutes until she is escorted out of the cell and taken

---

[5] In discussing the recordings, the Court purposely avoids characterizing the nature of Watkins's contacts with Fox, as they are not relevant to the disposition of Watkins's sanctions motion.

7

to the medical area by wheelchair. (Video Files 804, 510, 036; Cameras 4059, 4044, 4046, 4058). One camera positioned inside the cell captured the entire duration of Watkins's detainment (Camera 4059), while two others depict what occurred in the hallway outside the cell (Cameras 4044, 4058). Although none of these cameras were capable of recording audio, Smith collected approximately thirty minutes of video from a nearby camera pointed away from the cell that did capture sound and that picked-up Watkins screaming and kicking the door of the cell. (Camera 4046).

Several weeks after the evidentiary hearing, Watkins filed another supplemental memorandum in support of her sanctions motion. (Doc. 81). Viewing this submission in conjunction with Watkins's other related filings, as well as the contentions she made at the May 2023 oral argument, it appears she asserts the following spoliation claims: (1) Fox improperly failed to disclose audio from her time in the holding cell; (2) Fox also improperly failed to produce footage from a camera closer to the third booking counter that may have shown Fox "continuing to injure" her; (3) the video from outside the holding cell had been manipulated, as it is purportedly twenty seconds shorter than the video from inside the cell and does not include a certain officer entering the cell on two separate occasions; and (4) Fox wrongly declined to turn over an affidavit by Smith documenting an interview of Earling.[6] For relief, Watkins seeks an adverse inference instruction requiring the jury to presume that the allegedly destroyed information was unfavorable to Fox; an order precluding Fox from raising

---

[6] To the extent Watkins suggests that Smith should have interviewed Earling, she fails to demonstrate how this argument bolsters her spoliation claims. (Doc. 81).

the lack of "early notice" to challenge Watkins's claims; permission for Watkins to introduce evidence at trial regarding the circumstances surrounding Fox's averred failure to retain and produce this evidence; and an order directing Fox to provide an affidavit from Smith regarding the "disposition of the . . . Earling [i]nterview." (Doc. 53 at 11–12).[7]

II.

A.

"'Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). A district court has "broad discretion" to sanction a party for the spoliation of evidence. *Romero v. Regions Fin. Corp./Regions Bank*, 2019 WL 2866498, at *3 (S.D. Fla. July 3, 2019) (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)).

Where, as here, a court is presented with one or more spoliation claims involving electronically stored information (ESI), it must look to Rule 37(e), as amended in 2015. That rule authorizes the particular "measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures." Fed. R. Civ. P. 37(e), advisory committee notes

---

[7] Aside from her sanctions motion, Watkins also moved to her amend her complaint to add the PCSO as a party on the grounds that it failed to preserve discovery material and maintained an "insufficient" camera in the holding cell. (Doc. 65). The Court denied Watkins's request. (Doc. 82).

to 2015 amendment.[8]  In doing so, Rule 37(e) "forecloses reliance on inherent authority or state law to determine when certain measures should be used." *Id*. As a result, "many courts have held that Rule 37(e) . . . provide[s] the exclusive mechanism by which [a court] must analyze spoliation allegations involving ESI." *Romero*, 2019 WL 2866498, at *4 (collecting cases).

> Rule 37(e) states:
>
> If [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1)  upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

As this language reflects, four threshold elements must be established for Rule 37(e) to apply: (1) there must have been a duty to preserve ESI; (2) the ESI must have been lost or destroyed; (3) the ESI must have been lost as a result of the party's failure to take reasonable steps to preserve it; and (4) the ESI must not have been restorable

---

[8] The Eleventh Circuit has stated that although the advisory committee notes are not binding upon the courts, they are afforded "'great weight'" in interpreting Rule 37(e). *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 2022 WL 433457, at *13 n.19 (11th Cir. Feb. 14, 2022) (quoting *Horenkamp v. Van Winkle & Co.*, 402 F.3d 1129, 1132 (11th Cir. 2005)).

or recoverable through supplemental discovery. *See id.*; *Burns v. Medtronic, Inc.*, 2017 WL 11633269, at *3 (M.D. Fla. Aug. 9, 2017) (citation omitted); *Akkasha v. Bloomingdales, Inc.*, 2019 WL 11215918, at *4 (S.D. Fla. Oct. 18, 2019) (citation omitted); *Sosa v. Carnival Corp.*, 2018 WL 6335178, at *10 (S.D. Fla. Dec. 4, 2018) (citation omitted). When these elements are not met, a court must deny a request "for spoliation sanctions or curative measures." *Sosa*, 2018 WL 6335178, at *10 (internal quotation marks and citation omitted).

Even if Rule 37's threshold criteria are satisfied, a court may only award sanctions under subsection (e)(1) if it finds "prejudice" to another party, or under subsection (e)(2) if it finds that the spoliating party acted with the "intent to deprive" the opposing side of the ESI in question. Fed. R. Civ. P. 37(e); *Title Cap. Mgmt., LLC v. Progress Resid., LLC*, 2017 WL 5953428, at *3 (S.D. Fla. Sept. 29, 2017) (citation omitted). With respect to subsection (e)(1), a court must assess the extent of the "prejudice from the loss of [the ESI]," which necessarily includes ascertaining the information's importance in the litigation. Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment; *Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288, at *10 (M.D. Fla. Oct. 28, 2019) (noting that the questions of significance for the Rule 37(e)(1) prejudice inquiry include "the scope of the prejudice and the importance of the spoliated ESI"). There is a disagreement, however, as to what actually constitutes "prejudice" under Rule 37. Some courts in the Eleventh Circuit, for example, "have suggested that a non-spoliating party suffers 'prejudice' under Rule 37[ ] if the unavailable ESI would have helped evaluate the merits of [her] positions, regardless

11

of whether the ESI would be favorable [to] [her] case." *Wilson v. HH Savannah, LLC*, 2022 WL 3273718, at *7 (S.D. Ga. June 1, 2022) (citations omitted). Other courts, by contrast, require the moving party to demonstrate that the spoliated evidence "'would [have] affirmatively support[ed] the movant's claim.'" *Id.* at *7 n.11 (citation omitted).

As for subsection (e)(2), a movant seeking to prove an "intent to deprive" must show more than negligence or even gross negligence by the alleged spoliating party. Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment. This standard is the "equivalent of bad faith" and generally means the destruction of information or items "*for the purpose of hiding adverse evidence*." *Skanska USA Civil Se. Inc. v. Bagelheads, Inc.*, 2023 WL 4917108, at *13 (11th Cir. Aug. 2, 2023) (alteration in original) (quoting *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020)).

B.

With these principles in mind, the Court turns to Watkins's spoliation claims. As referenced earlier, these claims appear to relate to: (1) a purported interview of Earling; (2) the lack of audio from a camera located inside Watkins's holding cell; (3) missing footage from the camera closest to the third booking counter, which Watkins claims would display Fox "continuing to injure" her; and (4) video from outside the holding cell which Watkins asserts should, but does not, depict a certain officer twice entering her cell. (Doc. 53). The Court will address each of these evidentiary challenges in turn.

Beginning with the alleged recorded interview of Earling, Fox maintains—as noted above—that no such interview occurred. To buttress this contention, Smith

testified at the evidentiary hearing that she did not solicit a sworn statement from Earling during the Internal Affairs investigation because she obtained consistent testimony from eight other individuals and was able to review the jail surveillance videos as well.

Watkins does not counter Smith's testimony—which the Court credits—with any evidence demonstrating that Earling's statement was ever procured. Instead, she appears merely to contend in the main that the PCSO erred in the first place by not interviewing Earling given his alleged importance as a witness. (Doc. 81). Because Watkins fails to meet her burden of demonstrating that an interview of Earling occurred or that a recording of such an interview ever existed, the Court need not conduct a Rule 37(e) analysis pertaining to this matter.

As for the lack of an audio recording from within the holding cell, Smith testified—as discussed previously—that the camera inside the cell was not capable of recording sound but that, as part of the Internal Affairs investigation, she gathered video footage from a nearby camera that captured some of what could be heard from the cell. Although Watkins claimed at the evidentiary hearing that she could not discern any such audio coming from the cell, the Court listened to the recording and could hear Watkins yelling and kicking the door. In light of this fact, as well as Smith's testimony, which the Court again credits, Watkins does not meet her burden of demonstrating that Fox improperly failed to turn over any audio recordings from inside her holding cell. Thus, the Court need not conduct a Rule 37(e) analysis concerning this item either.

Regarding Watkins's claim that the video produced from inside the holding cell omits a twenty-second segment depicting an unnamed officer injuring her, the Court reviewed the video production in detail and did not find any evidence indicating that a portion of the recording had been manipulated or was missing. More specifically, the footage from Camera 4059, which captures Watkins' entire time in the cell, and Camera 4044, which displays the hallway outside Watkins' cell for the duration she was inside, does not reveal any discrepancies.

Finally, with respect to the video from the camera closest to the third booking counter that Watkins asserts may reflect Fox "continuing to injure" her, the evidence before the Court demonstrates that Fox did not have possession, custody, or control of that recording during the jail's ninety-day retention period. *See Wooden v. Barringer*, 2017 WL 5140518, at *7–8 (N.D. Fla. Nov. 6, 2017) (stating that "[o]nly parties with possession, custody, or control over the [disputed] evidence may be sanctioned for their failure to preserve the evidence" and that while an employer may be deemed to have control over data possessed by a non-party employee, the same is not true where the data is possessed by a non-party employer);[9] *see also Storey v. Effingham Cnty.*, 2017 WL 2623775, at *3 (S.D. Ga. June 16, 2017) (ruling that the plaintiff was not entitled

---

[9] Akin to the situation in this case, the plaintiff in *Wooden* alleged that the defendant—a correctional officer employed by the Alachua County Sheriff's Office (ACSO)—used excessive force against him when he was incarcerated. *Wooden*, 2017 WL 5140518, at *1. The plaintiff contended during the litigation, *inter alia*, that the defendant acted in bad faith by failing to preserve video recordings from areas such as hallways in the jail and a medical center. *Id*. at *2. The court rejected this argument, finding that the defendant officer did not have a duty to preserve this evidence because he never had any control over the recordings as an ASCO employee. *Id*. at *7–8 (citations omitted).

to sanctions for spoliation of a surveillance video at a jail where the individual defendants "could have done nothing to prevent or spur the destruction of these videos regardless of their own awareness of their importance"). The Court notes in this regard that Fox attested in his sworn affidavit he did not have access to the surveillance recording equipment or the ability to "edit, delete, or alter" the recordings, and that he could not even view the jail surveillance footage "without a sergeant or higher-ranking deputy logging into the system." (Doc. 55-1). Watkins does not contest these attestations and even acknowledged at the May 2023 oral argument that she believed them to be true.[10] (Doc. 73 at 43–44). And because Fox did not have possession, custody, or control over the challenged video footage, he cannot be sanctioned if it was not preserved. *Wooden*, 2017 WL 5140518, at *7–8; *Storey*, 2017 WL 2623775, at *3. Watkins's failure to satisfy this element is fatal to her sanctions motion. *Sosa*, 2018 WL 6335178, at *10.

Even if Watkins could meet all four of the threshold elements under Rule 37, she would still have to establish either prejudice or that Fox acted with an intent to deprive. She does neither.

To start, there is no evidence that Fox acted improperly. To the contrary, Fox has shown that he had no responsibility or authority relative to the jail's video collection. (Doc. 55-1). And the PCSO, which did have possession, custody, and

---

[10] Specifically, in response to the Court's question as to whether she had any evidence Fox had "control over, or the ability to direct" that video be preserved or maintained, Watkins responded "yeah, of course he doesn't." (Doc. 73 at 43–44).

15

control of the video recording system, gathered multiple videos in connection with Watkins's public records request and the Internal Affairs complaint. Further, it is evident from the testimony and other information before the Court that these recordings were subsequently turned over to Watkins.

As for prejudice, the Court cannot determine whether the missing video would have captured Fox "continuing" to injure Watkins, as Watkins claims. On the other hand, the Court can assume at a minimum that other footage of Watkins approaching the third booking counter, which would be notably brief given what has already been produced, could have helped evaluate the merits of her position regardless of whether it was favorable to her case. *Wilson*, 2022 WL 3273718, at *7.

Nonetheless, any such prejudice is offset by the multiple other recordings disclosed to Watkins. As described above, taken together, this video footage tracks Watkins's movements throughout the jail and includes several recordings from different angles of her interaction with Fox at the first booking counter. Watkins is also depicted walking to the cell and can be heard claiming that Fox was hurting her. Moreover, at trial, Watkins can offer her own testimony as to what occurred, along with any medical records and presumably the testimony of other witnesses as well.

Based upon the foregoing, the Court finds that Watkins's Rule 37 sanctions motion directed at Fox to be unsupported. And having found that such sanctions are unwarranted, the Court declines Watkins's request for a ruling at this juncture that she be allowed to tender evidence "regarding the circumstances surrounding [PCSO's or

16

Fox's] failure to retain and produce this evidence." (Doc. 53 at 2, 11). Such a decision is best left to the judge presiding over the trial.

C.

There is one additional item that merits the Court's attention. In his response to Watkins's instant motion, Fox asks that Watkins be sanctioned for, *inter alia*, repeatedly raising unsubstantiated, "scurrilous accusations of bad-faith and wrongdoing." (Doc. 55). Fox, however, is not permitted to seek affirmative relief in a response to a motion. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."); M.D. Fla. R. 3.01(a) (requiring the submission of a motion requesting relief). Thus, the Court will deny this request as procedurally infirm.

III.

In light of all the above, it is hereby ORDERED that Watkins's *Motion for Sanctions for [Spoliation] of Evidence* (Doc. 53) is denied.

SO ORDERED in Tampa, Florida, this 7th day of September 2023.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record